Filed 1/4/24  In re E.B. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re E.B. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E081976 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J290686 & J290687 & J290688 & J290689 & J290690) |
| v. | |
| B.B. et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed.

Michelle D. Pena, under appointment by the Court of Appeal, for Defendant and Appellant B.B.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant J.R.

1

Tom Bunton, County Counsel, Pamela J. Walls, Special Counsel for Plaintiff and Respondent.

Defendants and appellants J.R. (Mother) and presumed father B.B. (Father; collectively, Parents) are the parents of Br.B. (female born Nov. 2017), J.B. (female born Oct. 2020), E.B. (female twin born Sept. 2021), and G.B. (female twin born Sept. 2021; collectively, Twin Girls).[1] Mother has another child, A.G. (female born Feb. 2013).[2] On appeal, Parents contend that the juvenile court's findings and orders at the Welfare and Institutions Code[3] section 366.26 hearing terminating their parental rights to the Twin Girls must be reversed. For the reasons set forth *post*, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

On August 26, 2021, the family came to the attention of San Bernardino County Children And Family Services (CFS) for allegations of emotional abuse to Br.B. and J.B. by Parents. Law enforcement was called after Father hit Mother.

On September 3, 2021, Mother "acknowledged that domestic violence took place. She reported that the only times that the father has been physically violent with her is when she is pregnant." Mother was near the end of her pregnancy with the Twin Girls.

---

[1] In 2022, Mother gave birth to twin boys. They are not parties to this appeal; they are subjects of a separate dependency case in Riverside County.

[2] A.G.'s biological father passed away in 2014.

[3] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

Mother stated that Father chased her into the kitchen and slapped her after Mother confronted Father about getting a job. Mother reported that Father had previously served jail time for hitting Mother when she was pregnant. Mother denied that either she or Father had a history of drug abuse. Although Father did not reside in the home, Mother reported that she was unemployed so she "relied heavily on the father as he provided food, shelter and basi[c] necessities for herself and the children." Mother stated that "her dilemma was having multiple children, being pregnant and no support, and that is why she felt required to stay in the relationship." Mother admitted that "within the last 'few months' the father's demeanor and personality had been changing," but she denied father used illicit drugs or drank alcohol extensively. Mother called the social worker on September 14, 2021, and informed her that a court granted a temporary domestic violence restraining order against Father.

On September 16, 2021, when the social worker was interviewing A.G., Br.B. "interrupted and reported that the father spent the night at the house the previous night and the father had been arrested." When A.G. was asked to confirm Br.B.'s statement, A.G. "was unwilling to do so." When the social worker asked Mother, Mother denied that Father had been in their home. Mother eventually admitted that Father was at the home to help with the children and take A.G. to school. Mother then stated, "that the father had been arrested and taken to jail on an open warrant for the domestic violence incident that occurred on August 26, 2021." Mother stated that she had not communicated with Father since his arrest.

3

On September 17, 2021, Father called the social worker "requesting to be interviewed and to verify what he need[ed] to do in order to comply with CFS." Father stated that on August 26, 2021, Mother would not let him leave when Father tried to leave the house. Therefore, Father pushed Mother. "He denied hitting her." Father then "acknowledged the previous incident of domestic violence but denied hitting [Mother]. He reported 'it's normal relationship stuff.' " Father declined services and reported being "sober from marijuana and alcohol for three months." Father, however, would not provide details. The social worker ended the call when Father became verbally combative, condescending, and rude. "However, before terminating the call the [social worker] advised the father after he calmed down to call back or text if he wanted to continue the conversation."

A few days later, Mother gave birth to the Twin Girls.

On September 23, 2021, the social worker "obtained a signed detention warrant" for the children. Law enforcement served the warrant at Mother's home. Father was arrested for violating the restraining order while attempting to flee the home. Br.B and the Twin Girls were placed in a foster home; A.G. and J.B. were placed with the maternal grandparents.

On September 27, 2021, CFS filed section 300 petitions on behalf of the children. A.G.'s petition alleged that Mother had a substance abuse problem and a history of domestic abuse under section 300, subdivision (b). The petitions on behalf of the other four children alleged that Parents had substance abuse problems and histories of domestic abuse, and Father had an extensive criminal history under section 300, subdivision (b).

4

The petitions also alleged that Father left a loaded firearm within the reach of A.G., under section 300, subdivisions (b) and (j).

At the detention hearing on September 28, 2021, Parents and their attorneys were present. The court found a prima facie case established that the children came within section 300 and continued their detention. The court also ordered a same-day drug test for Parents, and told them that a refusal or failure to test would be deemed a positive test. The court then ordered supervised visitation.

Notwithstanding the court's order, neither Mother nor Father drug tested after the detention hearing.

At the jurisdiction and disposition hearing on October 19, 2021, Parents and their attorneys were present. At the hearing, the juvenile court found the following allegations true: (1) as to AG, that she came within section 300, subdivision (b); and (2) as to E.B., G.B., J.B. and Br.B., that they came within section 300, subdivisions (b) and (j). The court removed the children from Parents' custody, and ordered reunification services with increased visitation between the Twin Girls and Mother.

On April 12, 2022, CFS filed a Status Review Report for the six-month review hearing. In the report, the social worker reported that Parents were still in a relationship and moved into a new apartment together. The children were assessed and they were determined not to qualify for any mental and emotional services. They appeared happy and comfortable in their placements.

The social worker provided that Mother participated in services. Her "individual counseling" counselor requested additional sessions. Mother missed several drug tests. Father also participated in services and missed several drug tests.

At the six-month review hearing on April 19, 2022, Parents and their attorneys were present. The juvenile court granted unsupervised visits.

In a status review report for the section 366.21 12-month hearing, the social worker reported that Parents married. Mother gave birth to twin boys in September 2022. Parents continued to participate in court-ordered services.

The social worker reported that the children continued to be happy and comfortable in their placement. Moreover, the social worker noted no concerns regarding visitation.

At the October 5, 2022, 12-month review hearing, Parents and their attorneys were present. The juvenile court set the matter for mediation, followed by a further review hearing.

In a Mediation Report dated October 18, 2022, the social worker noted that Mother missed drug tests on September 7, September 26, and October 4, 2022. On September 15, 2022, however, Mother's doctor provided a note stating that Mother would be unable to test due to her pregnancy. The social worker wrote that Mother would "start her random drug testing again after November 14, 2022." The social worker also reported that since "[t]here were no concerns [regarding the twin boys,] Riverside CPS would not accept a referral."

6

The social worker and Parents participated in the mediation. At the mediation the parties agreed "to begin unsupervised overnights and weekends after the next hearing," and "[u]pon 4 successful weeks / visits to transition to a 29-day visit."

At the hearing the following day, Father and attorneys for Parents were present. Mother did not attend. The court stated that at the mediation, "[t]here was a full agreement between the parties to begin unsupervised, overnights, and weekends after today's date. And then upon four successful weeks, visits are to transition to a 29-day visit. [¶] The Court would be in agreement with setting the matter out 60 days to December 19 and granting authority for visitation as agreed to by the parties."

After discussing the issue with counsel, the juvenile court scheduled a further 12-month review hearing for December 19, 2022. The court then stated: "I'll find good cause and in the best interest of the minors to continue the matter to transition them home to [Parents]. I'll grant authority for [Parents] to begin unsupervised visits, overnights, and weekends. And then upon four successful weeks, the Court will grant authority for the children to have an extended visit with [Parents]."

In an Additional Information to the Court filed on December 14, 2022, the social worker reported that overnight and weekend visits proceeded with no issues. Thereafter, all five children began their 29-day trial visits. On November 7, 2022, however, Mother texted the social worker indicating that the family was being evicted from their apartment. Thereafter, Parents eventually worked out a payment plan and moved back. Although the doctor's note excusing Mother from drug testing expired on November 14, 2022, Mother failed to drug test on November 18, 2022. Father also missed his drug test.

7

At the December 19, 2022, continued hearing, Mother and attorneys for Parents were present. Father was not present. The court continued the hearing to review the 29-day trial visit. The juvenile court ordered that Children's Advocacy Group and CFS were to have unannounced access to the children. The juvenile court explained to Mother, "[s]ince the children remain in your care on an extended visit, I'm ordering that you allow Children's Advocacy Group—the attorneys that represent the children and their social worker—have access to your home to assess the children while they remain with you on an extended visit. . . . [¶] . . . [¶] . . . The children's attorney and the children's attorney's social worker. They may make announced visits to speak to their clients and see the children in your home."

In the January 11, 2023, Additional Information to the Court, the social worker reported that Mother missed her only drug test in December. Father missed two drug tests. Mother stated that she forgot to test because the children were in her home, and Father stated that he was sick. The social worker attempted to make unannounced visits but no one answered or responded, even though the social worker heard the television on one attempt and saw the family car on another attempt. In addition, Parents failed to respond to the social worker's calls and texts. When the social worker was finally able to see the family at an unannounced visit, the social worker discussed the importance of complying with the juvenile court's orders to complete random drug tests. Subsequently, Father tested negative but Mother missed another drug test.

At the January 11, 2023, hearing, Father and attorneys for parents were present. Mother did not attend the hearing. The court set the matter for a contested 12-month

review hearing. The court also terminated the trial visit and reverted Parents' visitations to supervised visits. The court further ordered Parents to drug test that day. The court again reminded Parents that failing to test would be considered a positive result.

CFS filed an addendum report on January 31, 2023. In the report, the social worker provided that J.B. and A.G. were placed with their maternal grandparents again. The Twin Girls and Br.B. were placed in a new foster home.

On January 19, 2023, Riverside CPS contacted Parents regarding the twins boys. Riverside CPS requested that Parents take saliva drug tests. Father's results were inconclusive, and Mother refused to test. Later that day, Mother confronted Father; it led to a physical alternation. Father "busted" Mother's lip. Father was subsequently arrested for spousal abuse. Riverside CPS removed the twin boys on January 20, 2023.

On January 23, 2023, Mother "completed a random drug testing for Riverside County which was negative." The Riverside social worker, however, believed that Mother "may have 'taken something' " so was "talking about obtaining a hair follicle test." Riverside CPS reported that Mother refused to take a hair follicle drug test. Mother took numerous drug tests for both cases in Riverside and San Bernardino. She tested negative for several tests but tested positive for amphetamines on January 20, 2023.

During this time, Mother moved into a friend's home, and then to her aunt's home in Los Angeles.

At the contested review hearing on February 2, 2023, Father and Parents' attorneys were present. Mother was not present at the beginning of the hearing but eventually appeared telephonically after several attempts to reach her.

After counsel for Parents, the children, and CFS presented their arguments, the juvenile court found that neither parent benefitted from services. The court stated, "the Court cannot find that [Parents] have demonstrated capacity and ability to complete the objectives of the treatment plan and provide for the children's safety, protection, physical and emotional health. It's clear that while they may have completed their classes, they have failed to benefit from those classes." The juvenile court then stated that "over the objection of [Parents], the Court will adopt the findings and orders set forth in the addendum report of today's date."

The court ordered the children as continued dependents of the court, terminated reunification services to parents, and set the matter for a contested section 366.26 hearing.

On May 19, 2023, CFS filed its Section 366.26 WIC Report. In the report, the social worker reported that the Twin Girls, who were one year old, were happy in their placement with their prospective adoptive parents. The Twin Girls were placed with the foster parents on September 23, 2021, and then again on February 16, 2023. "When asked to describe their relationship with the children, [the foster mother] stated, 'I feel like they are mine, they don't know anyone else but me and my husband, when they went home for the trial period, they had a hard time and so did we'. [The foster parents] stated, 'They are the princesses and have brought so much joy into our household.' " The

10

social worker noted that the foster parents look "affectionate and nurturing to [the Twin Girls]." Moreover, both foster parents wished "to legalize their parental relationship with he children and [were] very committed to providing them permanency through adoption."

At the contested section 366.26 hearing on August 16, 2023, Parents and their respective attorneys were in attendance. After hearing from the attorneys for Parents, the children, and CFS, the juvenile court found that the Twin Girls were likely to be adopted. Moreover, after analyzing the elements of the parental benefit exception to adoption under *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), the court found that the exception did not apply. Thereafter, the court terminated the parental rights of Parents to the Twin Girls.

On August 16, 2023, Father filed a timely notice of appeal, and on August 18, 2023, Mother filed a timely notice of appeal.

## DISCUSSION

### THE JUVENILE COURT PROPERLY FOUND THAT THE BENEFICIAL EXCEPTION TO ADOPTION DID NOT APPLY

On appeal, Mother contends that the juvenile court erred in finding that the parental benefit exception to adoption did not apply. Mother states: "The judgment terminating parental rights must be reversed: In light of [the Twin Girls'] relationships with their parents and the consequences of severing those relationships—as well as the children's relationships with their older sisters, younger brothers, and extended family— the juvenile court abused discretion in deciding against applying the parent-children relationship exception to terminating parental rights."

11

"Father joins Mother's argument in her appellant's opening brief that the juvenile court abused its discretion when it found the parent-child relationship did not apply and the order terminating Mother's parental rights must be reversed; if the judgment terminating Mother's parental rights is reversed, the judgment terminating Father's rights must also be reversed."

At a section 366.26 hearing, the juvenile court selects and implements a permanent plan for the child. If a child cannot be returned to his or her parents and is likely to be adopted if parental rights are terminated, a court must select adoption as the permanent plan unless one of the exceptions provided in section 366.26, subdivision (c), applies. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 946; *In re Celine R.* (2003) 31 Cal.4th 45, 53 (*Celine R.*).)

In order to invoke an exception under section 366.26, subdivision (c)(1)(B)(i), "the moving parent must establish, by a preponderance of the evidence, each of the following elements: (1) that the parent has regularly visited with the child; (2) that the child would benefit from continuing the relationship; and (3) that terminating the relationship would be detrimental to the child." (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 316 (*Katherine J.*).) This exception "to the general rule that the court must choose adoption where possible—'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' " (*Celine R.*, *supra*, 31 Cal.4th at p. 53.)

We review the juvenile court's findings on the first two elements under the substantial evidence standard of review. (*In re LA-O* (2021) 73 Cal.App.5th 197, 206 (*LA-O*).) "But 'the ultimate decision—whether termination of parental rights would be

detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion.' " (*Id.*, at p. 206.) " 'A court abuses its discretion only when " ' "the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " ' " (*LA-O*, at pp. 206-207.)

In this case, the juvenile court analyzed the parental benefit exception under *Caden C.*, *supra*, 11 Cal.5th 614 and *In re Autumn H.* (1994) 27 Cal.App.4th 567. After discussing both *Caden C.* and *Autumn H.*, the juvenile court stated: "Stated otherwise, the trial Court must determine whether terminating parental rights serves the child's best interest. The Court acts in the child's best interest in a specific way by deciding whether the harm of severing a relationship outweighs the security and the sense of belonging in [a] new family would confer. [¶] In looking at the relationship between [Parents] and the children, the Court is cognizant that the relationship between parents and children may be shaped by . . . set factors that include the age of the children, the portion [of the] children's life spent in the parent's custody, whether there are positive or negative effects of interaction between the parent and child, and whether a child has a particular need. [¶] In this case, as [CFS's counsel] stated, and as set forth in the report that was received into evidence, [the Twin Girls] were born [in September 2021]. They came into protective custody on September 23rd, 2021, and they were in their first foster care placement for just over 14 months when they were returned home on January 11, 2023. And then on February 16, 2023, they were removed again and placed in the previous concurrent planning home of the current prospective adoptive parents."

13

The court then went on to discuss the elements of *Caden C.*, as they applied to the current case: "As [Mother] indicated, the twins lived with her about one and a half months. Both [Mother] and [Father] satisfied the first element of *In re Caden C.* It appears both have visited on a regular basis and are visiting within the confines of the Court's order. The visits have been one time per month for two hours. According to the .26 report of June 2nd, [Parents] have had monthly supervised visits, which are separate, and the visits have been going well. The mother testified she has not missed any visits. She described what takes place during the visits, including playing with the twins, feeding them, and spending time together."

The court noted that Parents testified that "the children are shy at first" until they wanted to play. Therefore, the juvenile court found that "both [Parents] have established the first prong of the elements set forth in *In re Caden C.*"

However, the court went on to state that Parents have failed to establish "proof of a relationship the continuation of which would benefit the children such that termination of parental rights would be detrimental to the child." The court stated that the Twin Girls "have only lived with [Parents] for a month and [a] half or six weeks at best. There's been no indication that there is any emotional dysregulation at the end of the visits, no crying." The court went on to note that there were "no temper tantrums, nothing to indicate that the separation between the children and [Parents] cause[d] anguish to the children.: Instead, the court noted that Father stated the Twin Girls looked serious at the end of the visits and wanted "to keep playing."

14

Therefore, the juvenile court found "that [Parents] have not met the burden of proof under *In re Caden C*. There has been insufficient evidence presented to allow the Court to deviate from the legislative preference for adoption, and this is not a case in which exceptional circumstances exist to allow the Court to deviate from the legislative preference for adoption."

Therefore, for the Twin Girls, the court adopted "the findings and orders that have been submitted," and terminated "the parental rights of [Parents] and all unknown fathers." The court also found that adoption was "the children's permanent plan." Furthermore, the court stated: "The Court is finding that the children's placement is necessary; the children's placement is appropriate; the children remain dependents of the Court."

We agree with the juvenile court's reasoning and findings. There was no evidence of any emotional attachment the Twin Girls had for their parents. The Twin Girls were placed in the prospective adoptive home just days after being born and spent only one and a half months with Parents when they were infants. Hence, we agree with the court due to the limited time the Twin Girls spent with Parents, Parents have failed to establish "proof of a relationship the continuation of which would benefit the children such that termination of parental rights would be detrimental to the child."

However, even if we could find that there was some benefit to maintaining the relationship between the Twin Girls and their parents, we find that there would be no detriment to the Twin Girls with the termination of their relationship with Parents. This court recently explained that " 'in assessing whether termination would be *detrimental*,

15

the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home.' [Citation.] The court must ask, 'does the benefit of placement in a new, adoptive home outweigh "the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]" ' " (*LA-O*, *supra*, 73 Cal.App.5th at p. 206.)

Here, the juvenile court did just that. There is no evidence that severing the relationship between the Twin Girls and Parents would be detrimental to them. As noted above, the Twin Girls were removed from their home when they were just days old. Although Parents visited regularly, and the visits went well, there was no evidence of any parent-child relationship, significant or not.

" '[T]he beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with her natural parent. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229 [a parent must demonstrate something 'more than frequent and loving contact, an emotional bond with the child, or pleasant visits']; *In re Angel B.* (2002) 08 Cal.App.4th 454, 458 ['for the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt'].)" (*Katherine J.*, *supra*, 75 Cal.App.5th at p. 316.)

In this case, there is no evidence that the Twin Girls would be "greatly harmed" by the termination of their natural parent-child relationship with Mother. (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 466.) The Twin Girls are barely two years old and lived with parents for a brief time, the girls never asked for Parents and did not react emotionally

when visits with Parents ended.  As the juvenile court stated, Parents "have not established proof of a relationship the continuation of which would benefit the children such that termination of parental rights would be detrimental to he child.  The children have only lived with [Parents] for a month and [a] half or six weeks at best.  There's been no indication that there is any emotional dysregulation at the end of the visits, no crying.  There's no temper tantrums, nothing to indicate that the separation between the children and the mother and father causes anguish to the children."

Therefore, we conclude Parents failed to show that the juvenile court's findings lack the support of substantial evidence or that its exercise of discretion rested on an unsupported factual basis.  The juvenile court properly found the parent-child relationship exception to adoption did not apply.

## DISPOSITION

We affirm the findings and orders of the juvenile court.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
J.

We concur:

McKINSTER _____
Acting P. J.

FIELDS _____
J.

17